IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| RAMON OSEGUERA-ALANIS,<br>          Movant, | CRIMINAL NO.<br>1:05-CR-067-CC-GGB-1 |
| v. | CIVIL ACTION NO.<br>1:13-CV-01998-CC-GGB |
| UNITED STATES OF AMERICA,<br>          Respondent. | MOTION TO VACATE<br>28 U.S.C. § 2255 |

**FINAL REPORT AND RECOMMENDATION**

Ramon Oseguera-Alanis ("Movant" or "Oseguera") has filed a motion to vacate sentence under 28 U.S.C. § 2255 [Doc. 197]. Movant seeks to challenge the constitutionality of his 40-year sentence that was imposed on September 28, 2007 [Doc. 174], following his guilty plea on March 8, 2006 [Docs. 106, 107]. Presently before the Court for consideration are: (1) Movant's § 2255 motion to vacate [Doc. 197] and (2) the United States of America's (hereinafter "Government") response to Movant's motion to vacate [Doc. 204].

**I.    BACKGROUND**

On February 15, 2005, Oseguera, Gustavo Lara Murillo ("Lara"), and Ignacio Cortes Valencia ("Cortes") were indicted by a federal grand jury for (1) conspiracy to

possess with the intent to distribute methamphetamine and to manufacture methamphetamine (Count One); (2) manufacturing methamphetamine, aided and abetted by each other (Count Two); and (3) possessing with intent to distribute methamphetamine, aided and abetted by each other (Count Three).  [Doc. 14].

Attorney Thomas E. Stewart ("Stewart") entered an appearance for Oseguera on February 22, 2006, substituting for Oseguera's previous retained attorney. [Docs. 97, 105].

On March 8, 2006, Oseguera, while represented by Stewart, tendered a plea of guilty to all three counts of the indictment pursuant to a negotiated plea agreement. [Docs. 106, 107, 201].  The Government proffered at the plea hearing that Oseguera had participated in setting up a "superlab" in a residence.  A superlab is a laboratory that can manufacture at least ten pounds of methamphetamine in a single cook in one day.  The Government proffered evidence that beginning in June of 2003, Oseguera made purchases of numerous items used to supply the lab; that thirty-five pounds of psuedophedrine was found at the lab; that amount of psuedophedrine would yield between 20 and 30 pounds of pure methamphetamine; that agents seized 5.2 kilograms of methamphetamine at the lab that had been packaged for distribution;

2

and that agents also seized $9,100 of drug proceeds from a suitcase with Oseguera's name on it. [Doc. 201 at 25-6].

Through counsel, Oseguera substantially agreed with the Government's proffer, only disputing the date that he became involved with the lab. [*Id.* at 27].

The plea agreement contained the following waiver of appeal:

LIMITED WAIVER OF APPEAL : To the maximum extent permitted by federal law, the defendant voluntarily and expressly waives the right to appeal his sentence and the right to collaterally attack his sentence in any post-conviction proceeding (including, but not limited to, motions filed pursuant to 28 U.S .C. § 2255) on any ground, except that the defendant may file a direct appeal of an upward departure from the otherwise applicable sentencing guideline range . The defendant understands that this Plea Agreement does not limit the Government's right to appeal, but if the Government appeals the sentence imposed, the defendant may also file a direct appeal of his sentence on any ground. Likewise, the defendant voluntarily waives all constitutional, legal, and equitable defenses to forfeiture of assets described by this Plea Agreement. The defendant further agrees to waive all constitutional and statutory challenges in any manner (including direct appeal, habeas corpus, collateral attack, or any other means) to any forfeiture carried out in accordance with this Plea Agreement on any grounds, including that the forfeiture constitutes an excessive fine or punishment.

[Doc. 107 at 4-5].

At the plea hearing, the court took all of the steps required by Rule 11 of the Federal Rules of Criminal Procedure to ensure that Oseguera's plea of guilty was knowingly and voluntarily entered before the court accepted the plea. [Doc. 201].

As part of that process, the court explained the Waiver of Appeal to Oseguera and established that he understood it:

> Court: Do you also understand that under some circumstances you or the government may have the right to appeal any sentence this Court might impose pursuant to the guidelines?
>
> Oseguera: Yes.
>
> Court: And according to the terms of your plea agreement, you entered into a limited waiver with the government regarding this plea and also your sentence, which will be imposed later. Do you understand according to the plea agreement you will not be able to appeal your sentence unless the sentence is an upward departure from the applicable custody guideline range, or if the government appeals, then you'll be free to appeal, you can appeal it only in those two instances; do you understand that?
>
> Oseguera: Yes.
>
> Court: Do you also understand that in your limited waiver you gave up the right to collaterally attack your sentence in a postjudgment proceeding?
>
> Oseguera: Yes.

[Doc. 201 at 16].

Oseguera's sentencing did not take place until September 28, 2007. [Doc. 202]. Prior to that date, the Government arrested Alfredo Santiago Moreno ("Santiago"). Santiago was charged in a separate indictment with, *inter alia*, conspiring with Oseguera, Cortes and Lara to manufacture and possess

4

methamphetamine. *United States v. Santiago*, Case No. 1:06-CR-461-CC-GGB, at Doc. 3. At Santiago's trial on April 11, 2007, Lara testified to the following facts related to Oseguera (*Id.* at Doc. 51):

- Lara had known Oseguera since 1989, (Doc. 51 at 7-8);

- in December of 2004, Lara and Oseguera were both in Mexico making crystal methamphetamine, the same drug they were making in the United States when they were arrested on February 9, 2005, (*Id.* at 9, 53-54, 67-68); Oseguera and Santiago were partners in making methamphetamine, (*Id.* at 9-10, 45);

- Oseguera asked Lara to come to Atlanta to assist Oseguera and Santiago in making methamphetamine here, and after Lara agreed, Oseguera made the arrangements for someone to help Lara illegally cross the border from Mexico into Texas, (*Id.* at 9-11, 57, 60, 65, 72);

- Lara arrived in Atlanta around January 30, 2005, i.e., approximately 10 - 11 days prior to his arrest; Santiago picked Lara up at a gas station, and paid the van driver who had driven Lara from Texas to Atlanta, (*Id.* at 7, 11-15, 21, 72);

5

- Santiago took Lara to the house at 200 Church Road, and showed him "what a big laboratory [Oseguera] has," (*Id.* at 16-17);

- Oseguera arrived in Atlanta approximately three or four days after Lara arrived in Atlanta, (*Id.* at 24, 27, 57);

- approximately three or four days after Lara arrived in Atlanta, on two occasions, Lara, Oseguera, Santiago and Cortes went to hardware stores to buy supplies, including gloves, a press, and paint thinner, (*Id.* at 21-22, 68);

- Oseguera, Lara and Cortes cooked methamphetamine at the 200 Church Road house on two occasions, (*Id.* at 26-29, 42-44, 65);

- Oseguera was in charge of making the methamphetamine, and Lara was Oseguera's helper, (*Id.* at 34-35, 53-54, 57, 67);

- After they were arrested, Oseguera told Lara to take all the blame, and if he did that Oseguera would give Lara a house in Mexico; or alternatively, Oseguera told Lara to blame other people they did not know, (*Id.* at 47-48, 53, 64); and

- Oseguera hired and paid for Lara's first attorney, (*Id.* at 48-49).

AO 72A
(Rev.8/82)

Lara had not begun cooperating with the Government until after he was sentenced to 210 months in custody on October 20, 2006. [Doc. 181 at 2]. After his cooperation, the Government moved for a reduction in Lara's sentence under Federal Rule of Criminal Procedure 35(b). [Doc. 181]. On July 30, 2008, Lara's sentence was reduced to ninety months based upon his cooperation. [Doc. 189].

The Probation Office's pre-sentence report ("PSR") on Oseguera calculated a total offense level of 46 based on the following:

- An initial base offense level of 38 pursuant to § 2D1.1(c)(1), based on in excess of 3.88 kilograms of methamphetamine ("ice");

- a three-level enhancement for substantial risk to human life and/or the environment pursuant to § 2D1.1(b)(8)(B),

- a three-level enhancement for aggravating role pursuant to § 3B1.1; and

- a two-level enhancement for obstruction of justice pursuant to § 3C1.1.

(PSR, ¶¶ 48, 49, 52, 53, 56).

Applying criminal history category I, the Probation Office concluded that Oseguera's recommended Guidelines custody range was life imprisonment. (PSR, Part D). Oseguera objected to the three-level enhancement for substantial risk to human life and/or the environment, the two-level enhancement for obstruction of

7

justice, and the failure to recommend a two-level reduction for acceptance of responsibility pursuant to § 3E1.1. (PSR, ¶¶ 49, 53, 55).

At Oseguera's sentencing hearing, relying in part on Lara's testimony, the Government took the position that Oseguera lied when he was debriefed by the Government after pleading guilty and agreeing to cooperate. [Doc. 202 at 12-26]. During his debriefings, Oseguera admitted he was involved in setting up the lab, purchasing the supplies, and cleaning the lab, but denied any further involvement, including Lara's allegations that he participated in two instances of cooking methamphetamine at the lab. [*Id.* at 21-27].

Oseguera's counsel argued that Oseguera was truthful in his debriefing and that Lara's version of the facts was wrong. To support his version, Oseguera called Lara as a witness at the sentencing hearing and attempted to impeach Lara's description of the role that Oseguera played in the conspiracy. [*Id*. at 32-40]. Lara, however, maintained that Oseguera had helped cook the methamphetamine on two occasions and testified consistently with the account he had provided during Santiago's trial. [*Id.* at 29-43].

The Court overruled all of Oseguera's objections to the PSR. [Doc. 202 at 5-43]. The Court concluded that the chemicals and processes used in the

methamphetamine laboratory presented a risk to the neighborhood.  [*Id.* at 7-12].  In assessing the two-level obstruction of justice enhancement and denying the associated acceptance of responsibility reduction, the Court relied upon:  (1) Lara's testimony during Santiago's trial, during which Lara testified that Oseguera directed Lara to take all the blame, or to blame other people they did not know, and hired and paid for Lara's first attorney; and, (2) the Government's proffer that Oseguera lied when he was debriefed by the government after pleading guilty and agreeing to cooperate.  [*Id.* at 12-26].

The Court found that the Government had proven by a preponderance of the evidence that Oseguera obstructed justice, and therefore awarded a two-level enhancement for the obstruction.  [*Id.* at 43].  The Court also found that the issue of acceptance of responsibility was intertwined with the obstruction issue, and therefore denied a reduction for acceptance of responsibility.  [*Id.*].  The Court found that Oseguera's final Guidelines custody range was life imprisonment.  [Id. at 44].  However, after considering the 18 U.S.C. § 3553(a) factors, the Court imposed a below-Guidelines sentence of 40 years of imprisonment.  [*Id.* at 45-55].

9

In his § 2255 petition, Oseguera seeks relief based on a purported affidavit from Lara.[1] [Doc. 197 at 11-14]. That affidavit, in English,[2] is dated December 12, 2012.[3] The affidavit states that Lara lied in testifying that Oseguera "was the cook," and that Santiago "was the organizer." He states that Lara himself was the organizer and Oseguera was "nothing more than my errand boy," who made purchases for Lara. [*Id.*]. The affidavit further states that Lara lied when he testified that Oseguera had offered Lara a house in Mexico if Lara took the blame. [*Id.*]. The affidavit states that Lara lied in his earlier testimony because his partner, "Jose," would have killed Lara's family in Mexico. [*Id.*].

Oseguera's § 2255 petition states that the "newly discovered evidence" (Lara's affidavit), conclusively shows that Oseguera is "actually innocent."

---

[1] Oseguera also states that he has learned since "trial" that the Government suppressed airline ticket receipts that were exculpatory to him. I will assume that he is referring to the statement in Lara's affidavit that the D.E.A. had confiscated airline tickets showing that Oseguera had arrived in Atlanta a few days prior to the arrest of Lara and Oseguera. [Doc. 197 at 13]. However, this evidence was not suppressed. The PSR refers to an airline ticket dated February 2, 2005, for Oseguera's travel from Ontario, California to Atlanta, Georgia. [PSR, ¶ 18].

[2] Lara did not speak English and required the use of an interpreter when he testified at the sentencing hearing. [Doc. 202 at 30].

[3] According to the Government, Lara was released from custody on August 22, 2011 and returned to Mexico on or about that date because he was not lawfully in the United States.

10

However, Oseguera does not actually contend that he is innocent of conspiring to manufacture methamphetamine.[4]  Rather, Oseguera contends that Lara exaggerated Oseguera's role in the conspiracy, and that his false testimony caused Oseguera to have a higher guideline range and lose the opportunity for a sentence reduction. [Doc. 197 at 2].  The petition contains a "request for new trial" based on Lara's recantation and the Government's use of Lara's allegedly false testimony.  [*Id.* at 4]. Oseguera also alleges that he received ineffective assistance of counsel because counsel did not discredit Lara's false testimony.  [*Id.* at 7].

## II.     DISCUSSION

### A.     Oseguera's § 2255 motion is barred by the waiver in his plea agreement.

A collateral attack waiver is enforceable if the Court discussed the waiver provision with the defendant during the guilty plea colloquy, or if it is manifestly clear from the record that the defendant understood the full significance of the

---

[4]Lara's affidavit, upon which Oseguera relies, contends that Lara had Oseguera help him by opening up a bank account a few months before Lara entered the United States, depositing ten thousand dollars into this bank account, and purchasing supplies for the manufacture of methamphetamine in November 2004.  He also states that he arranged for Oseguera to be his "errand boy" and Oseguera came back to the United States to help him in early February 2005.  [Doc. 197 at 13].

11

collateral attack waiver. *See United States v. Bushert*, 997 F. 2d 1343, 1351 (11th Cir. 1993) (discussing appeal waivers).

Here, the district court discussed the waiver with Oseguera at the plea hearing and Oseguera acknowledged that he understood it. The court's discussion and the written plea agreement make it manifestly clear that Oseguera understood the full significance of the waiver. Thus, the waiver is enforceable and his § 2255 motion should be dismissed. *See Williams v. United States*, 396 F.3d 1340, 1342 (11th Cir. 2005) (holding defendant may not circumvent sentencing appeal waiver by collaterally attacking sentence through claim of ineffective assistance of counsel).

**B.     Oseguera's claims of an unfair trial are without merit because Oseguera waived his right to trial and pleaded guilty.**

In his petition Oseguera asks for a new trial. However, Oseguera did not have a trial. He knowingly and intelligently waived his right to a trial and entered a plea of guilty. Therefore, his claim of an unfair trial and request for new trial are without merit.

Osegura cites Rule 33 of the Federal Rules of Criminal Procedure. However, by its express terms Fed. R. Crim. P. 33 is applicable only to trials. Rule 33 does not provide a vehicle for a new sentencing after a guilty plea. *See United States v. Blackwell*, Criminal No. 3:04cr00040, 2008 WL 318291, at *3 (W.D. Va. Feb. 4,

2008) (collecting cases).  Also, a motion for a new trial based on newly discovered evidence must be filed within three years after the finding of guilty.  Fed. R. Crim. P. 33(b).  Oseguera's motion is well beyond this three-year period.

### C. New evidence is not a valid basis for a § 2255 petition.

Notwithstanding Oseguera's waiver of his right to file a § 2255 petition, his claims are not cognizable under § 2255.  An error that is not jurisdictional or constitutional will form the basis for § 2255 relief only where "the claimed error constituted a fundamental defect which inherently results in a complete miscarriage of justice."  *United States v. Addonizio*, 442 U.S. 178, 185 (1979).  A prosecutor's knowing use of false testimony can form the basis of a § 2255 petition.  *See DeMarco v. United States*, 928 F.2d 1074 (11th Cir. 1991).  However, even accepting Lara's affidavit as legitimate, Lara does not allege that the Government knew that he was testifying falsely.  *See United States v. Holladay*, 566 F.2d 1018, 1019-20 (5th Cir. 1978) (presentation of a witness who recants or contradicts his prior testimony is not to be confused with eliciting perjury); *United States v. Battle*, 264 F. Supp. 2d 1088, 1208 (N.D. Ga. 2003) (holding that the fact that a witness's previous testimony is inconsistent with later testimony does not establish perjury or that the prosecutor knowingly presented false testimony).

13

Oseguera is actually basing his § 2255 petition on the **previously unknown** testimony of Lara.  However, newly discovered evidence, even in the form of a confession by another, is not a valid basis for a collateral attack because it goes to the merits of the conviction, not its legality.  *Shaver v. Ellis*, 255 F.2d 509, 511 (5th Cir. 1958).

### D. Oseguera's counsel did not render ineffective assistance.

Lara's alleged recantation comes over five years after his testimony.  Even if Oseguera had not waived his right to bring this § 2255 petition, there is no basis for the court to conclude that Oseguera's counsel was ineffective at sentencing for failing to convince the court that Lara's testimony was false.   Oseguera's counsel called Lara as a witness for the purpose of cross-examination and attempted to impeach the testimony that Lara had given at the trial of Santiago.  Oseguera points to no impeaching information that was available to his counsel at the time of Oseguera's sentencing that counsel failed to use in his cross-examination of Lara.

### III. CERTIFICATE OF APPEALABILITY

According to Rule 11 of the Rules Governing Section 2255 Proceedings for the United States District Courts, a district court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  Under 28 U.S.C.

14

§2253(c)(2), a certificate of appealability shall not issue unless "the applicant has made a substantial showing of the denial of a constitutional right." A prisoner satisfies this standard by demonstrating that reasonable jurists would find that the district court's assessment of his constitutional claims is debatable or wrong and that any dispositive procedural ruling by the district court is likewise debatable. *See Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Movant has failed to make a substantial showing of the denial of a constitutional right. As discussed above, Movant waived his right to collaterally attack his sentence, and in any event, his claims are without merit. Accordingly, **I RECOMMEND** that a certificate of appealability be **DENIED**.

## IV.  CONCLUSION

Based on the foregoing, **I RECOMMEND** that Movant's motion to vacate sentence [Doc. 197] be **DENIED.**

**IT IS FURTHER RECOMMENDED** that a certificate of appealability be **DENIED**.

15

The Clerk is **DIRECTED** to terminate the referral to me.

**IT IS SO RECOMMENDED**, this 7th day of March, 2014.

_Gerrilyn G. Brill_
GERRILYN G. BRILL
UNITED STATES MAGISTRATE JUDGE